UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED INDICTMENT** |
| v. | 25 Cr. ____ ( ) |
| ANDREW NGUYEN, | **25 CRIM   5065** |
| Defendant. | |

## Overview

1.    For approximately three years, between at least in or about 2020 and at least in or about November 2023, ANDREW NGUYEN, the defendant, repeatedly abused his position as a police officer in the New York City Police Department (the "NYPD") by soliciting and accepting tens of thousands of dollars in bribe payments in exchange for assisting another individual ("CC-1") with the operation of CC-1's drug trafficking enterprise.

2.    ANDREW NGUYEN, the defendant, had a long-standing friendship with CC-1 and knew that CC-1 was a drug dealer involved in the trafficking of heroin, cocaine, and marijuana. NGUYEN helped CC-1 operate CC-1's drug business in several different ways, including by abusing his position as an officer in the NYPD.

   a.    *First*, NGUYEN transported drugs, including approximately eight kilograms of cocaine, for CC-1 while NGUYEN was armed with a firearm, including a 9-millimeter Glock Model 26 pistol, which was NGUYEN's NYPD-authorized off-duty firearm, and in possession of NYPD credentials and an NYPD parking placard, which NGUYEN planned to use to evade arrest in the event he was pulled over by other members of the NYPD or, in the case of his firearm, to protect CC-1 if violence occurred.

   b.    *Second*, NGUYEN drove CC-1 to drug meetings, again while possessing a

firearm, including his NYPD-authorized off-duty firearm, NYPD credentials, and an NYPD parking placard, all for the same purpose.

      c.    *Third*, NGUYEN queried names of other drug dealers in NYPD databases at the request of CC-1, provided that confidential information to CC-1, and, at least once, offered to arrest one of those drug dealers for CC-1 in exchange for payment.

      d.    *Fourth*, NGUYEN, in exchange for payment from CC-1, used an NYPD vehicle to conduct an unsanctioned car stop of CC-1, during which NGUYEN purported to seize drugs and drug proceeds from CC-1. Following the car stop, NGUYEN submitted false reports to the NYPD regarding the car stop, to help CC-1 avoid repayment of a drug-trafficking-related debt.

      e.    *Fifth*, NGUYEN expressed a willingness to, in exchange for payment from an associate of CC-1 ("CC-2"), kidnap two drug dealers who owed money to CC-2 by conducting an unsanctioned arrest of those individuals, although this plan never came to fruition.

      f.    *Sixth*, NGUYEN conspired with CC-1 and another criminal associate of CC-1 ("CC-3") to rob a drug-money courier under the guise of NGUYEN conducting another unsanctioned car stop, although NGUYEN and his co-conspirators did not carry out their agreement to commit the robbery.

    3.    In addition, in or about November and December 2023, law enforcement conducted an undercover operation during which ANDREW NGUYEN, the defendant, transported what NGUYEN believed to be five kilograms of cocaine in exchange for $5,000 from CC-1. In truth, the "drugs" were sham and NGUYEN had obtained them from an undercover law enforcement officer whom NGUYEN believed was a drug dealer.

    4.    Overall, ANDREW NGUYEN, the defendant, who was at all relevant times an officer in the NYPD, accepted more than $30,000 in bribe payments from CC-1 (and solicited tens

of thousands of dollars in additional bribes) in connection with NGUYEN's participation in CC-1's drug trafficking enterprise.

### Relevant Individuals

5.      ANDREW NGUYEN, the defendant, joined the NYPD in or about January 2008. From that time through in or about December 2023, NGUYEN served as a uniformed police officer. From in or about January 2008 through in or about March 2023, NGUYEN had the title of "police officer" and worked, primarily, in Transit District 12, which serves passengers who use the New York City subways in parts of the Bronx. In or about March 2023, the NYPD placed NGUYEN on "modified duty," in a matter unrelated to NGUYEN's criminal work with CC-1. While on modified duty, NGUYEN was transferred to Public Service Area 7, which serves certain New York City Housing Authority developments in the Bronx, where he worked monitoring surveillance cameras. In or about December 2023, the NYPD terminated NGUYEN. Before he was terminated, NGUYEN was paid an annual salary of more than $100,000.

6.      CC-1 was the leader of a drug trafficking enterprise that sold millions of dollars' worth of heroin, cocaine, and marijuana in the New York City area, among other places, between approximately 2004 and 2014 and then again between approximately 2019 and 2023. CC-1 met ANDREW NGUYEN, the defendant, in or about 2006, before NGUYEN began working as a police officer.

7.      ANDREW NGUYEN, the defendant, and CC-1 developed a friendship that turned into a criminal partnership when NGUYEN was hired by the NYPD in or about 2008. As described in more detail below, CC-1 paid NGUYEN tens of thousands of dollars in bribes to assist CC-1 with the operation of CC-1's drug enterprise between approximately 2008 and 2009 and then again between approximately 2020 and November 2023.

**NGUYEN's Early Assistance to CC-1's Drug Enterprise (2008 to 2009)**

8.     After ANDREW NGUYEN, the defendant, became a member of the NYPD in or about January 2008, he began assisting CC-1 with the operation of CC-1's drug enterprise almost immediately. For approximately the next year—that is, until in or about 2009—NGUYEN repeatedly abused his position as an NYPD officer to help CC-1's drug business in exchange for payment from CC-1. Among other things, NGUYEN transported drugs for CC-1 while armed with a firearm; NGUYEN drove CC-1 to drug-related meetings while NGUYEN was armed with a firearm; and, at CC-1's request, NGUYEN conducted searches of NYPD databases to obtain and provide CC-1 with confidential information about certain drug dealers. NGUYEN transported CC-1 and CC-1's drugs with the understanding that, if stopped by members of the NYPD or other law enforcement agencies, NGUYEN would use his NYPD credentials to prevent law enforcement officers from inquiring further or searching NGUYEN, CC-1, or the vehicles NGUYEN and CC-1 were using.

9.     On one occasion in or about the fall of 2008, ANDREW NGUYEN, the defendant, assisted CC-1 in removing heroin and a firearm from a residence CC-1 was using as a stash house, in order to help CC-1 avoid detection from other members of the NYPD. Specifically, CC-1 was arrested by the NYPD for selling heroin to an undercover officer in or about October 2008 outside of the residence CC-1 was using as a stash house. While CC-1 was detained on criminal charges related to that drug transaction, CC-1 learned from other sources that members of the NYPD had conducted a search of CC-1's stash house. While the NYPD had failed to find the heroin and firearm that were stored in the stash house during that initial search, CC-1 was concerned that the NYPD would come back to search the stash house again. To prevent the NYPD from finding any evidence of CC-1's drug enterprise if they chose to return to the stash house, NGUYEN went to

4

the stash house, retrieved CC-1's heroin and firearm from the stash house, and took the heroin and firearm to CC-1's criminal associate—CC-2—for safekeeping.

**NGUYEN's Recent Participation in CC-1's Drug Enterprise (2020 to 2023)**

10.    In or about 2020, ANDREW NGUYEN, the defendant, who was still an NYPD officer, approached CC-1 and asked if CC-1 had any work for NGUYEN in CC-1's drug business because NGUYEN needed quick cash to cover NGUYEN's expenses. CC-1 agreed to allow NGUYEN to again assist CC-1 with CC-1's drug business.

11.    For approximately the next three years, from in or about 2020 through in or about November 2023, ANDREW NGUYEN, the defendant, helped CC-1 operate CC-1's drug enterprise in at least six different ways, including by abusing his position as an officer in the NYPD:

      a.    NGUYEN transported drugs for CC-1;

      b.    NGUYEN drove CC-1 to drug meetings;

      c.    NGUYEN queried names of other drug dealers in NYPD databases at the request of CC-1, provided that confidential information to CC-1, and, at least once, offered to arrest one of those drug dealers for CC-1;

      d.    NGUYEN conducted an unsanctioned car stop of CC-1, and submitted false reports to the NYPD regarding the car stop, to help CC-1 avoid repayment of a drug-trafficking-related debt;

      e.    NGUYEN expressed a willingness to work with CC-1 to kidnap two other drug dealers who owed money to CC-2 by conducting an unsanctioned arrest; and

      f.    NGUYEN conspired with CC-1 and another criminal associate of CC-1—CC-3—to rob a drug-money courier under the guise of NGUYEN conducting another

unsanctioned car stop.

12.    For this assistance with CC-1's drug business, ANDREW NGUYEN, the defendant, accepted more than $30,000 in bribe payments from CC-1, while also soliciting tens of thousands of dollars in additional bribes. The details of some of the criminal acts NGUYEN performed for CC-1 in exchange for payment are described below.

### NGUYEN Transported Cocaine for CC-1

13.    On two occasions between in or about 2020 and 2021, ANDREW NGUYEN, the defendant, transported a total of approximately eight kilograms of cocaine for CC-1 in exchange for payment from CC-1.

14.    *First*, in or around 2021, ANDREW NGUYEN, the defendant, transported approximately five kilograms of cocaine for CC-1. On an evening in 2021, while CC-1 was present at a bar in the Bronx, CC-1 was approached by a drug associate (the "Broker") who asked CC-1 if CC-1 could supply five kilograms of cocaine to a friend of the Broker. In response, CC-1 secured a supplier for the cocaine (the "Supplier") and told the Broker that CC-1 would deliver five kilograms of cocaine that evening. After confirming the deal, CC-1 told the Supplier that CC-1 would send a guy—that is, NGUYEN—to pick up the cocaine. CC-1 then called NGUYEN and told NGUYEN, in sum and substance, that CC-1 needed NGUYEN to pick up and then deliver something for CC-1. NGUYEN understood that the package CC-1 wanted NGUYEN to transport was drugs, which NGUYEN agreed to transport for CC-1 in exchange for $5,000. As NGUYEN typically did when transporting drugs for CC-1, NGUYEN was armed with his NYPD-authorized off-duty firearm. NGUYEN was also in possession of NYPD credentials and an NYPD parking placard, which NGUYEN planned to use to evade arrest in the event he was pulled over by other members of the NYPD. Then, at the direction of CC-1, NGUYEN picked up the five kilograms of

cocaine from the Supplier's apartment and delivered the drugs to a location in lower Manhattan. In connection with this transaction, NGUYEN accepted $5,000 in cash from CC-1 for NGUYEN's assistance.

15.    *Second,* in or around the end of 2021 or the beginning of 2022, ANDREW NGUYEN, the defendant, transported approximately three kilograms of cocaine for CC-1 in connection with another drug deal with the Broker. One evening, CC-1 received a call from the Broker who told CC-1, in sum and substance, that the Broker had another friend who wanted to buy cocaine. CC-1 secured the necessary cocaine from the Supplier, agreed to handle the transportation of the drugs, and called NGUYEN to handle the transport. CC-1 told NGUYEN that CC-1 had more work for NGUYEN and NGUYEN agreed to handle the job. As he was before, NGUYEN was in possession of his NYPD-authorized off-duty firearm, NYPD credentials, and an NYPD parking placard. Then, at the direction of CC-1, NGUYEN picked up the cocaine from the Supplier and delivered the cocaine to the Broker and the Broker's friend. The Broker's friend did not approve of the cocaine and declined to take possession of the drugs from NGUYEN. NGUYEN then drove the cocaine back to CC-1 who, in turn, told NGUYEN to take the drugs back to the Supplier. Even though the deal fell through, NGUYEN accepted $3,000 from CC-1 for NGUYEN's assistance.

### NGUYEN Escorted CC-1 to Drug-Related Meetings

16.    In addition to transporting drugs for CC-1, ANDREW NGUYEN, the defendant, also drove CC-1 to certain drug-related meetings during the relevant period. On those occasions, NGUYEN was in possession of both his police credentials and a firearm, specifically, his NYPD-authorized off-duty firearm. NGUYEN carried these items when transporting CC-1 so that NGUYEN could use them to evade further inquiry or even arrest in the event NGUYEN was pulled

over by other members of the NYPD or, in the case of his firearm, to protect CC-1 if violence occurred. NGUYEN also carried and displayed his NYPD-issued parking placard when escorting CC-1 on drug-related business, as a further means to evade detection from other law enforcement officers. In exchange for transporting and providing physical protection for CC-1, NGUYEN, at times, accepted approximately $1,000 to $2,000 per trip from CC-1.

### NGUYEN Ran Names of Other Drug Dealers Through the NYPD's Databases for CC-1

17.    On numerous occasions between in or about 2020 and November 2023, CC-1 contacted ANDREW NGUYEN, the defendant, through various encrypted messaging platforms to request that NGUYEN query the NYPD's databases to obtain confidential information about certain drug dealers with whom CC-1 was interacting. In response, and, at times, in exchange for approximately $1,000 for each name, NGUYEN queried the names of the other drug dealers provided to him by CC-1 and shared confidential information obtained from those queries with CC-1.

18.    For example, in or around February 2022, CC-1 asked ANDREW NGUYEN, the defendant, to provide confidential NYPD information on a particular drug dealer who owed CC-1 drug paraphernalia worth between $30,000 and $60,000 ("Drug Dealer-1"). On or about February 26, 2022, in exchange for payment from CC-1, NGUYEN, while off duty, twice queried the NYPD's databases for the name of Drug Dealer-1. NGUYEN then told CC-1 that there was a warrant out for Drug Dealer-1's arrest and offered to arrest Drug Dealer-1 for CC-1 in exchange for $20,000. NGUYEN did not ultimately arrest Drug Dealer-1, however, because both NGUYEN and CC-1 agreed it was too dangerous.

### NGUYEN Conducted a Contrived and Unsanctioned Car Stop and Seizure for CC-1 to Help CC-1 Avoid Paying a Drug-Trafficking-Related Debt

19.    On or about January 8, 2021, ANDREW NGUYEN, the defendant, conducted an

unsanctioned car stop of CC-1, during which NGUYEN purported to seize drugs and drug proceeds from CC-1. Following the unsanctioned car stop, NGUYEN submitted false reports to the NYPD to document the car stop, all to help CC-1 avoid repayment of a drug-trafficking-related debt. Specifically, CC-1 asked NGUYEN to conduct the staged car stop and seizure to help CC-1 avoid paying a $245,000 drug debt that CC-1 owed to an out-of-state marijuana supplier. Rather than pay the debt, CC-1 wanted NGUYEN to conduct the car stop and seizure so that CC-1 could tell his marijuana supplier that law enforcement had seized the money that CC-1 owed, which CC-1 believed would lead to the marijuana supplier forgiving his debt. CC-1 offered NGUYEN $10,000 to conduct this unsanctioned stop and seizure, and NGUYEN agreed to do it.

20.    On the day of the stop itself, ANDREW NGUYEN, the defendant, told CC-1 where to go to be "stopped." NGUYEN was on duty at the time and was driving an NYPD-issued vehicle. CC-1, who was driving with another criminal associate, followed NGUYEN's instructions and drove to an area in the Bronx near the post where NGUYEN was assigned. NGUYEN, who was waiting for CC-1 to arrive, used his NYPD-issued vehicle to pull over CC-1's vehicle. CC-1 had a criminal associate record the car stop, via a real-time video call with the marijuana supplier to whom CC-1 owed money, as a way to convince the supplier that the car stop and resulting seizure were legitimate. NGUYEN, who was in his NYPD uniform at the time, conducted the car stop, seized a bag from CC-1's car, and pretended to arrest CC-1. NGUYEN then drove CC-1 a few blocks away and released CC-1. Later that day, NGUYEN accepted $10,000 in cash from CC-1.

21.    As part of this scheme, NGUYEN generated and provided CC-1 with two NYPD property invoices alleging the seizure of cash and drugs, respectively, for CC-1 to use as proof that law enforcement, in fact, seized the money. NGUYEN's reports reflected the seizure of $245,000 and crack cocaine by NGUYEN from an individual with a name that closely resembled the name

9

of CC-1. The false invoices NGUYEN had created in the NYPD's property management system were voided by the NYPD approximately five days later, labeled as "unnecessary." Below are images of portions of the false reports that NGUYEN created to document the staged car stop and seizure that he carried out in exchange for payment from CC-1.





**NGUYEN and CC-1 Discussed Kidnapping Two Other Drug Dealers**

22.     During the time that ANDREW NGUYEN, the defendant, worked for CC-1's drug trafficking business, CC-1 introduced NGUYEN to at least one other drug dealer—specifically, CC-2, a criminal associate of CC-1—and offered NGUYEN's services as a corrupt NYPD officer to CC-2. In particular, in or around 2021 or 2022, CC-1 had discussions with CC-2, and then with Nguyen, about kidnapping two other drug dealers who owed money to CC-2 through NGUYEN conducting an unsanctioned arrest of those drug dealers in his capacity as an NYPD officer.

23.     More specifically, CC-2 had indicated to CC-1 that two drug dealers owed CC-2 money for an unpaid drug debt. While CC-2 did not expressly say so, CC-1 understood, from CC-1's prior dealings with CC-2, that CC-2 was no longer interested in being repaid by these individuals but was interested in retribution. CC-1 made an offer to CC-2 to have the two drug dealers picked up and brought to CC-2 in exchange for a cash payment from CC-2. CC-1's plan was that ANDREW NGUYEN, the defendant, who was still an NYPD officer, would conduct an

unsanctioned arrest of these drug dealers and, instead of bringing the drug dealers to a police precinct, deliver them to CC-2.

24.    After CC-2 expressed some interest in CC-1's proposal, CC-1 asked ANDREW NGUYEN, the defendant, if NGUYEN, in his capacity as a police officer, could draw up a fake arrest warrant, arrest the two drug dealers, and bring them to CC-2. NGUYEN responded, in substance and in part, that he would "look into it" and that he was "with it." NGUYEN specifically asked CC-1 if CC-1 wanted NGUYEN to get CC-2's money back from the two drug dealers, and CC-1 responded, in substance and in part, that CC-2's money did not matter anymore.

25.    Thereafter, CC-1 and CC-2 discussed payment for the kidnapping scheme. The plan failed to advance beyond the discussion of price, however, because CC-1 and ANDREW NGUYEN, the defendant, assessed that the compensation proposed by CC-2 was not worth the risk.

### NGUYEN Conspired with CC-1 and Others to Rob a Drug-Money Courier

26.    Approximately two years later, ANDREW NGUYEN, the defendant, and CC-1, together with yet another criminal associate of CC-1—that is, CC-3—agreed to rob a drug-money courier under the guise of NGUYEN conducting yet another unsanctioned car stop.

27.    Specifically, in or around early November 2023, CC-1 discussed with ANDREW NGUYEN, the defendant, a plan to rob someone whom CC-1 knew carried cash for drug dealers. By that time, CC-1 had already discussed the plan with CC-3, who was a drug dealer from whom CC-1 had purchased heroin and cocaine. Specifically, CC-1 proposed that NGUYEN—acting in his capacity as an NYPD officer—conduct an unsanctioned car stop of the drug-money courier and seize the courier's drug proceeds, which would then be shared between NGUYEN, CC-1, and CC-3.

28.     At the time that ANDREW NGUYEN, the defendant, CC-1, and CC-3 were plotting this robbery, NGUYEN was on modified duty with the NYPD because of an unrelated issue. Because NGUYEN was on modified duty, NGUYEN did not have access to a police vehicle or his firearm. As a result, NGUYEN and CC-1 planned for CC-1 to purchase a vehicle that resembled one commonly used by law enforcement to which NGUYEN would add police lights; CC-1 would also supply the firearms necessary for the robbery. Then, NGUYEN, and another person whom NGUYEN would bring to the operation, would use that modified vehicle, while armed with CC-1's firearms, to conduct the bogus stop and seizure.

29.     During in or about November and December 2023, ANDREW NGUYEN, the defendant, and CC-1 continued to discuss the robbery scheme, for example:

        a.      On or about December 1, 2023, NGUYEN and CC-1 engaged in the following discussion about the robbery during a recorded conversation:

| CC-1: | How about that other job that we was talking about, remember?" |
|---|---|
| NGUYEN: | N**** I'm about to leave on Tuesday. |
| CC-1: | Yeah, I know. But we gotta do our homework on that shit. |
| NGUYEN: | I know, that's what I am saying. I'm about to leave. |
| CC-1: | Damn. It's going to be a couple of million dollars. |
| NGUYEN: | We gotta figure out everything like, how many people, all that shit. |

        b.      On or about December 20, 2023, CC-1 wrote NGUYEN a message stating, "[w]e need to get that car I think it's going to be a go," to which NGUYEN responded, "Ok." CC-1 then asked NGUYEN if he could "start looking for it and send me the listing so I can get the money together. Asap. I think we have only a small window for this." A few minutes later, NGUYEN sent CC-1 the following online listing for a vehicle that NGUYEN said had "all the lights installed" (*i.e.*, police lights):



c.    CC-1 then asked NGUYEN to send CC-1 "a list of gear we going to need to look the part too. Where can we get badges at?" NGUYEN responded, "Badges. No idea. They won't even let me make them with my ID." About three days later, NGUYEN sent CC-1 another online listing for another vehicle commonly used by law enforcement, which the ad itself described as a "police interceptor." On or about December 23, 2023, NGUYEN sent CC-1 another message regarding a vehicle they could purchase online in connection with the above-described robbery:



30.     Ultimately, ANDREW NGUYEN, the defendant, and his co-conspirators did not carry out their agreement to commit the robbery.

### *NGUYEN Attempted to Deliver Five Kilograms of Cocaine on Behalf of CC-1*

31.     Around the same time as ANDREW NGUYEN, the defendant, was plotting the robbery of the drug-money courier—that is, in or about November and December 2023—law enforcement conducted an undercover operation, during which NGUYEN transported what NGUYEN believed to be five kilograms of cocaine in exchange for $5,000 from CC-1. The cocaine, however, was not real and NGUYEN had picked up the sham drugs from an undercover law enforcement officer.

32.     More specifically, on or about November 14, 2023, CC-1 communicated with ANDREW NGUYEN, the defendant, about a drug transaction CC-1 was planning to conduct. CC-1 messaged NGUYEN that CC-1 "wanted to holler at [NGUYEN] about work" (*i.e.*, drug-related activity). NGUYEN responded, "OK call me in about 30 min." A few weeks later, on or about November 30, 2023, CC-1 and NGUYEN had a recorded conversation about the planned

narcotics transaction. During the same meeting, NGUYEN referenced the unsanctioned car stop and seizure he had executed for CC-1 in 2021, and CC-1, using coded language, clarified that on this occasion, CC-1 needed NGUYEN to pick up drugs for him, in exchange for payment. Below is an excerpt from that recorded conversation:

| CC-1: | Remember last time you did that for me. Same Shit. |
|---|---|
| **NGUYEN:** | Alright. Just call me cause I gotta see where I'm going to be. Because I don't know if I'm going to be down in the Bronx or not. . . . Remember. I don't have a police car or nothing like that. |
| CC-1: | Yeah. No. No. No. Not like how we did it last time where you pulled me over . . . |
| **NGUYEN:** | Ok |
| CC-1: | . . . in the cop car, I mean the police car. . . Remember when you went with D to go pick that up for me. |
| **NGUYEN:** | Yes. |
| CC-1: | Yeah. Yeah. |
| **NGUYEN:** | Yes. Yes. |
| CC-1: | But this time it's a little more, so I'll pay you more, like 10. If that's OK. |
| **NGUYEN:** | Is it going to be early or late? |
| CC-1: | I don't know yet, man. I am trying to line that shit up now. |
| **NGUYEN:** | Aight. Just let me know. |

33.     The next day, while in the Bronx, ANDREW NGUYEN, the defendant, picked up five kilograms of what he believed was cocaine on behalf of CC-1. As it turned out, the cocaine was actually sham and the counterparty to the drug transaction was an undercover law enforcement officer. This transaction was recorded. Images from those recordings are included below, showing (i) NGUYEN in a vehicle on his way to the transaction, (ii) NGUYEN picking up what he believed to be five kilograms of cocaine, and (iii) NGUYEN receiving payment from CC-1 after delivering CC-1 the cocaine that turned out to be sham.



**After NGUYEN was Terminated from the NYPD, He Continued to Seek Work With CC-1's Drug Trafficking Enterprise**

34.    In late December 2023, ANDREW NGUYEN, the defendant, was terminated from

the NYPD for misconduct unrelated to his involvement in CC-1's drug enterprise. Thereafter,

NGUYEN continued to seek work from CC-1 as an employee of CC-1's drug enterprise. Specifically, on or about December 27, 2023, NGUYEN sent CC-1 text messages indicating that NGUYEN was terminated the previous day from the NYPD and asking CC-1, "how much would you pay me to work for you?"

### Statutory Allegations

### COUNT ONE
**(Conspiracy to Commit Honest Services Wire Fraud)**

The Grand Jury charges:

35.     The allegations contained in paragraphs 1 through 34 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

36.     From at least in or about 2020 through at least in or about November 2023, in the Southern District of New York and elsewhere, ANDREW NGUYEN, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

37.     It was a part and an object of the conspiracy that ANDREW NGUYEN, the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and to deprive the public and the NYPD of their intangible right to the honest services of NGUYEN, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346, to wit, NGUYEN agreed to and did solicit and accept tens of thousands of dollars in bribe payments from CC-1 in exchange for NGUYEN assisting CC-1 with CC-1's drug trafficking enterprise, including by, among other things,

performing an unsanctioned car stop of CC-1, during which NGUYEN purported to seize drugs and drug proceeds from CC-1, and following which NGUYEN submitted false reports to the NYPD regarding the car stop, in order to help CC-1 avoid repayment of a drug-trafficking-related debt, and NGUYEN transmitted and caused to be transmitted text messages and other electronic communications to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Section 1349.)

**COUNT TWO**
**(Honest Services Wire Fraud)**

The Grand Jury further charges:

38.    The allegations contained in paragraphs 1 through 34 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

39.    From at least in or about 2020 through at least in or about November 2023, in the Southern District of New York and elsewhere, ANDREW NGUYEN, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and to deprive the public and the NYPD of their intangible right to the honest services of NGUYEN, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, NGUYEN participated in a scheme to solicit and accept tens of thousands of dollars in bribe payments from CC-1 in exchange for NGUYEN assisting CC-1 with CC-1's drug trafficking enterprise, including by, among other things, performing a pretextual car stop of CC-1, during which NGUYEN purported to seize drugs and drug proceeds from CC-1, and following which NGUYEN submitted false reports to the NYPD regarding the car stop, in order to help CC-1 avoid repayment of a drug-trafficking-related debt, and NGUYEN transmitted and caused to be

19

transmitted text messages and other electronic communications to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343, 1346, and 2.)

## COUNT THREE
### (Conspiracy to Commit Federal Program Bribery)

The Grand Jury further charges:

40.     The allegations contained in paragraphs 1 through 34 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

41.     From at least in or about 2020 through at least in or about November 2023, in the Southern District of New York and elsewhere, ANDREW NGUYEN, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, bribery concerning a program receiving federal funds, in violation of Title 18, United States Code, Section 666(a)(1)(B).

42.     It was a part and object of the conspiracy that ANDREW NGUYEN, the defendant, being an agent of a local government, and an agency thereof, to wit, the NYPD, which received, in each of the calendar years 2019 through 2023, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, would and did corruptly solicit and demand for the benefit of a person, and accept and agree to accept, a thing of value from a person, intending to be influenced and rewarded in connection with business, a transaction, and a series of transactions of the NYPD involving a thing of value of $5,000 and more, in violation of Title 18, United States Code, Section 666(a)(1)(B), to wit, NGUYEN agreed to and did solicit and accept tens of thousands of dollars in bribe payments from CC-1 in exchange for NGUYEN assisting CC-1 with drug trafficking including by, among

other things, performing an unsanctioned car stop of CC-1, during which NGUYEN purported to seize drugs and drug proceeds from CC-1, and following which NGUYEN submitted false reports to the NYPD regarding the car stop, in order to help CC-1 avoid repayment of a drug-trafficking-related debt.

Overt Acts

43.    In furtherance of the conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed and caused to be committed in the Southern District of New York and elsewhere:

a.    On at least two occasions in or about 2021 and 2022, ANDREW NGUYEN, the defendant, transported drugs for CC-1 in vehicles operated by NGUYEN, with the understanding that, if pulled over by a police officer, NGUYEN would use his police credentials to avoid detection regarding NGUYEN's possession and transportation of the drugs.

b.    In or about January 2021, NGUYEN conducted an unsanctioned car stop of CC-1, during which NGUYEN purported to seize drugs and drug proceeds from CC-1, and following which NGUYEN submitted false reports to the NYPD regarding the car stop, in order to help CC-1 avoid repayment of a drug-trafficking-related debt.

(Title 18, United States Code, Section 371.)

**COUNT FOUR**
**(Federal Program Bribery)**

The Grand Jury further charges:

44.    The allegations contained in paragraphs 1 through 34 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

45.    From at least in or about 2020 through at least in or about November 2023, in the Southern District of New York and elsewhere, ANDREW NGUYEN, the defendant, being an

21

agent of a local government, and an agency thereof, to wit, the NYPD, which received, in each of the calendar years 2019 through 2023, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, did corruptly solicit and demand for the benefit of a person, and accept and agree to accept, a thing of value from a person, intending to be influenced and rewarded in connection with business, a transaction, and a series of transactions of the NYPD involving a thing of value of $5,000 and more, to wit, NGUYEN did solicit and accept tens of thousands of dollars in bribe payments from CC-1 in exchange for NGUYEN assisting CC-1 with drug trafficking including by, among other things, performing an unsanctioned car stop of CC-1, during which NGUYEN purported to seize drugs and drug proceeds from CC-1, and following which NGUYEN submitted false reports to the NYPD regarding the car stop, in order to help CC-1 avoid repayment of a drug-trafficking-related debt.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

**COUNT FIVE**
**(Conspiracy to Distribute Narcotics and Controlled Substances)**

The Grand Jury further charges:

46.    The allegations contained in paragraphs 1 through 34 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

47.    From at least in or about 2020 through at least in or about November 2023, in the Southern District of New York and elsewhere, ANDREW NGUYEN, the defendant, and others known and unknown, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to violate the controlled-substance laws of the United States.

48.    It was a part and an object of the conspiracy that ANDREW NGUYEN, the defendant, and others known and unknown, would and did distribute and possess with intent to

22

distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

49.     The controlled substances involved in the offense were (a) 5 kilograms and more of a mixture and substance containing a detectable amount of cocaine, its salts, optical and geometric isomers, and salts of isomers, in violation of Title 21, United States Code, Section 841(b)(1)(A), and (b) marijuana, which was intentionally and knowingly possessed with intent to distribute for remuneration, in violation of Title 21, United States Code, Section 841(b)(1)(D).

(Title 21, United States Code, Section 846.)

## COUNT SIX
### (Firearm Use, Carrying, and Possession)

The Grand Jury further charges:

50.     The allegations contained in paragraphs 1 through 34 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

51.     From at least in or about 2021 through at least in or about November 2023, in the Southern District of New York and elsewhere, ANDREW NGUYEN, the defendant, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, namely, the drug trafficking crime charged in Count Five of this Information, knowingly used and carried firearms, and in furtherance of such crime, possessed firearms, and aided and abetted the use, carrying, and possession of firearms.

(Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2.)

## COUNT SEVEN
### (Conspiracy to Commit Hobbs Act Robbery)

The Grand Jury further charges:

52.     The allegations contained in paragraphs 1 through 34 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

53.     From at least in or about October 2023 through in or about November 2023, in the

23

Southern District of New York and elsewhere, ANDREW NGUYEN, the defendant, and others known and unknown, knowingly combined, conspired, confederated, and agreed together and with each other to commit robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), and would and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, NGUYEN agreed with CC-1 and others to rob a courier of drug proceeds in the Bronx, New York.

(Title 18, United States Code, Section 1951.)

### COUNT EIGHT
**(Attempted Possession with Intent to Distribute Narcotics)**

The Grand Jury further charges:

54.    The allegations contained in paragraphs 1 through 34 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

55.    From at least in or about November 2023 through at least in or about December 2023, in the Southern District of New York and elsewhere, ANDREW NGUYEN, the defendant, knowingly and intentionally attempted to distribute and to possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

56.    The controlled substance involved in the offense was 5 kilograms and more of mixtures and substances containing a detectable amount of cocaine.

(Title 21, United States Code, Sections 812, 841(a)(1), and 841(b)(1)(A).)

### FORFEITURE ALLEGATIONS

57.    As a result of committing the offenses alleged in Counts One through Four and Count Seven of this Information, ANDREW NGUYEN, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States

Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

58.    As a result of committing the offenses alleged in Counts Five and Eight of this Information, ANDREW NGUYEN, the defendant, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any and all property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of said offenses and any and all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

59.    As a result of committing the offense alleged in Count Six of this Information, ANDREW NGUYEN, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d)(1), and Title 28, United States Code, Section 2461(c), any and all firearms and ammunition involved in or used in said offense.

SUBSTITUTE ASSETS PROVISION

60.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of ANDREW NGUYEN, the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third person;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be subdivided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and

Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the

defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 924, 981, and 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

JAY CLAYTON
United States Attorney